# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA

v.

JAMAL O. MARTIN, dob 1976

**CRIMINAL COMPLAINT**

CASE NUMBER: *07-61 m (AEG)*

I, Jill Ceren, the undersigned complainant, being duly sworn state the following is true and correct to the best of my knowledge and belief.  On May 17, 2007, in Milwaukee County in the Eastern District of Wisconsin, Jamal O. Martin, defendant herein, did: (1) attempt to kill a federal officer while that federal officer was engaged in official duties, in violation of in violation of Title 18, United States Code, §§ 1114 and 1113: (2) and discharged a firearm during and in relation to a crime of violence for which a person may be prosecuted in a court of the United States, in violation of Title 18, United States Code, § 924(c)(1)(A)(iii).

I further state that I am a Special Agent of the U.S. Drug Enforcement Administration.

The affidavit of Special Agent Jill Ceren is attached.

Continued on the attached sheet and made a part hereof:          ✔ Yes ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

May 17 , 2007
Date

at   Milwaukee, Wisconsin
City and State

Aaron E. Goodstein, U.S. Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Jill Ceren, being first duly sworn on oath, state that:

## I.  PURPOSE AND BACKGROUND

1.      I am a special agent for the United States Department of Justice Drug Enforcement Administration, working in the Milwaukee, Wisconsin District Office. I have been employed as a DEA agent for over 16 years. In the course of my work, I investigate violations of federal drug trafficking laws. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

2.      The information contained in this affidavit is based upon my personal observations and investigation, information relayed to me by other law enforcement agents and officers, and through official law enforcement reports. To the extent that the information is not based upon my personal knowledge, I believe it to be truthful and reliable.

3.      During the course of my employment, I have participated in at least 100 investigations involving the distribution of controlled substances, During my tenure with DEA, I have authored over 50 affidavits supporting wire and electronic intercepts, criminal complaints, search and seizure warrants. I have debriefed more than 100 defendants, informants, and witnesses who have personal knowledge regarding major narcotics trafficking organizations and activities.

4.      This affidavit is submitted in support of an application for criminal complaint charging Jamal O. MARTIN (DOB: 03-22-1976) for violations of (1) Title 18, United States Code, Sections 1114 and 1113, attempt to kill a federal officer while the officer was engaged in official duties; and (2) Title 18, United States Code, Sections 924(c)(1)(A)(iii), discharge of a firearm during

1

and in relation to a crime of violence for which a person may be prosecuted in a court of the United States. As detailed below, there is probable cause to believe that Jamal O. MARTIN has committed the afore-referenced federal violations.

## II.   PROBABLE CAUSE

5.      On May 16, 2007, United States Magistrate Judge Aaron E. Goodstein authorized a criminal complaint and arrest warrant charging that Jamal O. MARTIN and others knowingly and intentionally conspired to possess with the intent to distribute in excess of 100 kilograms of marijuana, a Schedule I controlled substance, in violation of Title 21, United states Code, Sections 846, 841(a)(1) and 841(b)(1)(B).  Magistrate Judge Goodstein also authorized a federal search warrant for MARTIN's residence located at 2850 N. 56th Street, Milwaukee, Wisconsin.

6.      On May 17, 2007, at approximately 10:10 a.m., special agents and task force officers of the United States Department of Justice, Drug Enforcement Administration (DEA) attempted to execute the above-referenced arrest and search warrants at 2850 N. 56th Street (a photograph of the front of the residence is attached as Attachment A).

7.      Your affiant and a task force agent were positioned at the rear of the residence for rear containment, approximately 50-60 feet from the front of the residence.  Three windows were positioned on the rear wall of the residence, facing east. The window closest to the southeast corner of the residence had no blinds down. The other two windows had the blinds pulled down. On the south side of the residence a rear door was located at the southeast corner facing south. Your affiant was stationed at the northeast corner of the house. The task force agent at the rear of residence was stationed close to the southeast corner, near the rear door.

8.      The front of the residence faces west and the external front door is approximately 25-

2

30 feet from N. 56ᵗʰ St. As can be seen from the photograph in Attachment A, there is an open wooden porch, approximately 6 x 15 feet, at the front of the residence leading to the external door. There are four windows, with blinds drawn, facing west on the open front porch. The closest window to the external front door is approximately 2 feet away. The external front door faces south, just to the right (if looking at the residence from the street) of the numbers "2850" affixed to the front of the residence. The front door leads into an enclosed porch area outside of the main portion of the residence. The external front door is a hollow steel, normal-sized exterior door. From the thresh hold of the external front door to the interior front door is approximately 8-10 feet. From the exterior door to the interior door is an enclosed porch area, approximately 8 x 10 feet. The enclosed porch area has windows with no blinds on the north and west side, and the interior front door on the east side. The enclosed porch also contained a lawn chair and a dining room chair. The interior front door is made of a wooden frame and approximately 15 window glass panels. The interior front door had a cloth curtain covering the glass panels from the inside.

9.     Shortly after 10:00 a.m., the DEA entry team positioned itself at the external front door on the open porch, the steps leading up the porch, and at the front of the residence. The entry team consisted of approximately six DEA special agents, all grown men between the ages 25-45 years old. All of the agents were wearing black ballistic vests that were marked in yellow and white bold letters spelling "POLICE" and "DEA." All of the special agents were armed with semi-automatic firearms. Most of the special agents were also wearing ballistic Kevlar helmets, including the special agent closest to the external door. The closest special agent to the external door also had a black, 3 foot long, 4 inch diameter battering ram with two handles. The second special agent closest to the door held a black, 1 x 4 foot ballistic shield also marked with white letter spelling

3

"POLICE."

10.     At approximately 10:10 a.m., members of the entry team, in unison, and including the closest special agent to the door, loudly yelled "POLICE," "DEA," and "SEARCH WARRANT" several times before breaching the external front door. Your affiant heard the special agents shouting from the rear of the residence. After the special agents shouted the afore-mentioned words several times, the closest special agent to the front external door used the battering ram 1-2 times to breach the external door. As the door was being rammed, special agents continued to yell "POLICE," "DEA," and "SEARCH WARRANT." After the front was breached, special agents flooded into the enclosed porch area and continued to yell "POLICE," "DEA," and "SEARCH WARRANT." It was determined that the internal door was locked so the special agent with the battering ram stepped up and began to ram the front internal door as he continued to yell "POLICE," "DEA," and "SEARCH WARRANT." The internal door was opened after 4-5 rams. The special agent with the ram said that after the door was opened, he saw a person, later identified as MARTIN, standing approximately 15-20 feet from the door inside the residence. As the special agent made eye contact with MARTIN, MARTIN raised a gun, pointed it at the special agent, and fired 1-2 shots. The special agent immediately dropped to the ground and then retreated out of the enclosed porch area as the special agent with the ballistic shield stepped into the doorway to cover the special agent who had the ram. Both agents then retreated to the open porch area with drawn weapons. At the same time, the other members of the entry returned fire and then retrieved to cover. At least one more shot was fired from within the house, through the outside window, closest to the external door.

11.     As the above-related events were taking place, your affiant continued to hear yells of "POLICE," "DEA," and "SEARCH WARRANT." Your affiant heard initial gun shots, followed

4

by "GUN," and then more gun shots. Within a few minutes, the task force agent at the rear of the residence signaled to your affiant that a person, later identified as MARTIN, was standing at the rear window closest to the rear door with his hands up against the window. The task force agent yelled at MARTIN and told MARTIN to keep his hands on the window. MARTIN was then told to exit the residence via the rear door and keep walking to the detached garage for the residence near the alley. MARTIN was then detained and placed in handcuffs. A woman, later identified as Narda Riley, and a small child then exited the residence. Riley was escorted immediately to the alley and detained. Your affiant asked MARTIN his name, your affiant told MARTIN that he was under arrest on a federal drug trafficking crime and for the events that just transpired. Immediately after your affiant explained the charges, the special agent who was shot at came to the rear of the residence. MARTIN looked up, saw the special agent, and said "I just want to tell him I'm sorry." The special agent approached MARTIN and identified MARTIN as the person who shot him at the front internal door. MARTIN then said to the special agent "I'm sorry man." MARTIN and Riley were then asked if there were any other persons inside the residence, if there was a gun in the residence, and how many guns inside the residence. MARTIN told special agents that there was one gun in the residence, a Glock 40, in a crate in the kitchen near the rear of the house. Special agents later found a Glock 40 in the residence as described by MARTIN. A Glock 40 is a .40 caliber, semi-automatic pistol.

12.     After the residence was cleared by DEA special agents, your affiant advised MARTIN of his constitutional rights in your affiant's government vehicle in the alley at the rear of 2850 N. 56th St. and asked MARTIN if MARTIN would answer some questions. MARTIN said no, but that he wanted to say "How sorry I am."

5

## III.  CONCLUSIONS

Based on the foregoing, I believe there is probable cause to believe that on May 17, 2007, Jamal O. MARTIN: (1) attempted to kill a federal officer while the officer was engaged in official duties in violation of Title 18, United States Code, Sections 1114 and 1113; and (2) discharged of a firearm during and in relation to a crime of violence for which a person may be prosecuted in a court of the United States, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(iii).

6

# ATTACHMENT A

